| | | |
|---|---|---|
| **RICKY L. NELSON,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **ORDER** |
| | ) | |
| **STEVEN K. MONTGOMERY,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

**THIS MATTER IS BEFORE THE COURT** on "Defendant's Motion For Summary Judgment" (Document No. 36);  "Defendant's Motion To Strike Affidavits Filed By Plaintiff In Opposition To Defendant's Motion For Summary Judgment" (Document No. 42);   and Plaintiff's "Motion To Compel" (Document No. 48).  The parties have consented to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c), and these motions are now ripe for disposition. Having carefully considered the motions, the record, and applicable authority, the undersigned will <u>grant</u> the motion for summary judgment and <u>deny</u> the motions to strike and to compel.

## I.        BACKGROUND

### A.  Factual Background

On or about March 30, 2002, Defendant Steven K. Montgomery ("Defendant" or "Montgomery") filed "Articles Of Incorporation" with the Secretary of State of North Carolina for Commencement Specialists, Inc. ("CSI"), an all-digital commencement photography company.  (Document No. 12, p.5);  <u>see also</u> (Document No. 12-1). Defendant became the President, an employee, and the majority shareholder (with 52% of shares) of CSI.  <u>Id.</u> *Pro se* Plaintiff Ricky L. Nelson, ("Plaintiff" or "Nelson") became the Vice President, an employee, and

a minority shareholder (with 30.5% of shares) of CSI. Id. Plaintiff's investment in CSI was to "be non-monetary in nature and in the form of expertise, intellectual property, management and 'sweat equity.'" Id. The remaining shares of CSI were held by Jeffrey Moore ("Moore"), a financial management consultant with 10% of the shares, and Ralph Auletta ("Auletta"), a photography and equipment consultant with 7.5% of the shares. Id.

On or about November 5, 2005, Plaintiff was diagnosed with a life threatening illness – Viral Encephalitis, which required several days of hospitalization and extended treatment. (Document No. 12, p.8). In or about January 2006, "Plaintiff began requesting work from and participation in, the day to day operations from the CSI office in Charlotte, NC. Id. These requests were denied by CSI employees." (Document No. 12, p.8). "Between February 1, 2006 and June 30, 2006 [Plaintiff] did perform some on location site work duties for CSI of a non-administrative nature." (Document No. 12, p.9).

On August 1, 2006, Plaintiff signed a CSI "Shareholder Agreement" (Document No. 12-2), confirming, *inter alia*, the distribution of shares as identified above. (Document No. 12, p.9). The "Shareholder Agreement" was also executed by Montgomery, Auletta and Moore. (Document No. 12-2, p.14). Shortly thereafter, on or about August 10, 2006, Defendant removed Plaintiff from the CSI Corporate Board and appointed Eileen Montgomery, Defendant's wife. (Document No. 12, p.9). Plaintiff alleges that on or about October 4, 2006, Defendant "covertly" acquired Moore's 10% share holdings, in violation of Section 2 of the "Shareholders Agreement" and Defendant's fiduciary duties. Id. Defendant presented Plaintiff with a CSI employment termination letter (Document No. 12-3) on or about November 16, 2006. (Document No. 12, p.10).

Plaintiff contends that sometime between January 15, 2007 and June 30, 2007, Event Photography Group Incorporated ("EPG") first attempted to purchase or acquire CSI. (Document No. 12, p.10). Plaintiff further contends that Defendant "never disclosed" this information, or other subsequent attempts by EPG to purchase or acquire CSI, in "direct breach of the Defendant's Fiduciary Duties as an officer and shareholder of CSI." (Document No. 12, pp.10-11). However, the Amended Complaint also asserts that it was "well known throughout the commencement photography industry that "[i]in 2007 EPG systematically contacted every commencement photography company in the United States." (Document No. 12, p.10).

In addition, Plaintiff asserts that Defendant purposefully kept from him that CSI had relocated to a "company incubator program located at the Ben Craig Center" in early 2007. (Document No. 12, p.11). Plaintiff also asserts that on multiple occasions between January 2007 and June 21, 2008, he and/or his counsel were informed by Defendant and/or his counsel that "CSI had no value and that there had been no offers to purchase or acquire CSI." (Document No. 12, p.11-12). However, the Amended Complaint notes that CSI "had a total income in 2006 of $945,727.65," and that in or about 2007-2008, CSI "was grossing in excess of $1,000,000 annually." (Document No. 12, pp.6, 11).

Between January 26, 2007 and March 6, 2008, Defendant and/or his counsel sought to purchase Plaintiff's CSI shares, and asserted that such sale was mandatory under the "Shareholders Agreement." (Document No. 12, p.12). Following Plaintiff's repeated refusals to sell, CSI filed a "Verified Complaint" against Plaintiff in the Superior Court of Mecklenburg County on December 10, 2007. (Document No. 12-4). CSI's "Verified Complaint" asserted causes of action for: (1) breach of contract – non-compete and confidentiality agreement; (2)

misappropriation of trade secrets;  (3) unfair and deceptive trade practices;  and (4) punitive damages.  Id.

On or about April 3, 2008, CSI's state court action was sent to arbitration with the American Arbitration Association.  (Document No. 12, p.13).  In lieu of arbitrating or further litigating CSI's claims, CSI, Plaintiff, Defendant, and Auletta executed a "Settlement Agreement Mutual Release And Covenant Not To Sue" (Document No. 12-6) on or about June 21, 2008.  Id. The Settlement Agreement provides in part:

> . . . the Parties desire to terminate any and all business or other relationship by and/or between the CSI Parties and Nelson and desire to settle and resolve the Lawsuit and the Arbitration **as well as resolve any and all further disputes** between or among the CSI Parties and Nelson . . . .
>
> This Agreement is a compromise reached among the Parties for a complete and final settlement of all claims, differences and causes of action between or among the CSI Parties and Nelson, **whether known or unknown and related in any way to the Lawsuit or to the Arbitration**. . . .
>
> CSI shall pay settlement funds to Nelson in the amount of $38,000.00 . . . .
>
> Nelson shall release any and all interest he has, may have, or may at any time have had in any shares of any CSI stock and transfer and assign such shares and all stock certificates related thereto to CSI. . . .
>
> . . . Nelson, by and for himself and on behalf of any and all of his agents,  . . .  **unconditionally releases, discharges, and will forever hold harmless the CSI Parties** and their agents, . . . **from each and every claim, cause of action, right, liability or demand of any kind or nature arising o[n] or prior to the date hereof** that Nelson or any of the above had, has or might claim to have against the CSI Parties or any agents, . . . .

(Document No. 12-6, pp.1-3) (emphasis added).

On or about October 25, 2009, Plaintiff purportedly first learned that CSI had been sold to EPG. (Document No. 12, p.14). Plaintiff contends that EPG purchased CSI in early 2009 for two million dollars ($2,000,000), and that Defendant and EPG "purposefully and knowingly" delayed the finalization of the purchase agreement until Defendant had acquired Plaintiff's CSI shares. Id.

**B. Procedural Background**

Plaintiff filed his original "Complaint" (Document No. 1) in this Court on October 23, 2012. "Defendant's Motion For A More Definite Statement" (Document No. 7) was filed on December 21, 2012. On February 13, 2013, the Honorable Graham C. Mullen granted "Defendant's Motion For A More Definite Statement," and ordered Plaintiff to amend his Complaint within ten (10) days. (Document No. 11). Judge Mullen specifically opined that

> Any claim for fraud requires a plaintiff to "state with particularity the circumstances constituting fraud . . ." Fed. R. Civ. P. 9(b). A complaint that fails to allege, among other things, "the time, place and contents of the false representations . . ." is not stated with the requisite particularity. Harrison v. Westinghouse Savannah River Co., 176 F.3d 776, 784 (4th Cir. 1999). The Court finds that it would be unreasonable to require the Defendant to respond to Plaintiff's claims for constructive fraud, fraud by omission and common law fraud unless Plaintiff amends his Complaint to set forth for each cause of action a more definite statement alleging the specific representation(s) or omission(s) Plaintiff believes supports each type of fraud alleged and when each misrepresentation or omission occurred.

Id.

On February 22, 2013, Plaintiff filed his "Amended Complaint" (Document No. 12). The "Amended Complaint" asserts the following causes of action: (1) breach of fiduciary duty; (2) constructive fraud; (3) constructive trust; (4) fraud by omission; (5) common law fraud; and (6) unfair and deceptive trade practice. (Document No. 12). Defendant Steven K. Montgomery

("Defendant" or "Montgomery") filed his "Answer And Affirmative Defenses" (Document No. 13) on March 11, 2013.

Defendant's "Motion For Judgment On The Pleadings" (Document No. 14) was filed on March 27, 2013. Following the parties' "Joint Stipulation of Consent To Exercise of Jurisdiction by a United States Magistrate Judge" (Document No. 17) filed on April 19, 2013, the undersigned issued a "Pretrial Order And Case Management Plan" (Document No. 24) on May 8, 2013.

On July 24, 2013, the Court denied Defendant's "Motion For Judgment On The Pleadings." (Document No. 27). In that "Order" (Document No. 27), the undersigned specifically noted that

> Plaintiff's allegations include assertions that Defendant "purposefully," "covertly" and "fraudulently" "denied, omitted and/or concealed" certain facts from Plaintiff. (Document No. 12). For example, Plaintiff clearly alleges that Defendant: (1) covertly acquired Moore's 10% of shareholdings in violation of the "Shareholder Agreement"; (2) improperly concealed ongoing communications and/or negotiations between CSI and EPG regarding EPG's interest in purchasing CSI; and (3) secretly relocated CSI to the Ben Craig Center. Id. Viewing the "Amended Complaint" in the light most favorable to the *pro se* Plaintiff suggests that these facts adequately support plausible claims.
>
> . . . the essence of Plaintiff's claims is that Defendant deliberately and improperly withheld critical information from Plaintiff up to and through June 21, 2008. Under the circumstances, the undersigned is satisfied that the "Amended Complaint" "contains 'enough facts to state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 129 S.Ct. at 1937 (quoting Twombly, 550 U.S. at 544). Although the undersigned finds Defendant's arguments regarding the application of the "Settlement Agreement" compelling in part, dismissal of this matter prior to discovery would be premature. Following discovery, Defendant may renew some, or all, of his current arguments in an appropriate dispositive motion.

(Document No. 27, pp.9-10).

On December 11, 2013, the undersigned granted with modification "Plaintiff's Motion For Extension Of Time For Discovery…" (Document No. 33).  (Document No. 35).  The undersigned noted that Plaintiff had requested "additional time to resolve discovery issues, request additional discovery, and/or to file a motion to compel."  Id.  (citing Document No. 33, p.4).  As a result, case deadlines were rescheduled as follows:  discovery completion – January 31, 2014;  mediation report – February 12, 2014;  dispositive motions – February 26, 2014;  and trial term – June 23, 2014.  Id.

"Defendant's Motion For Summary Judgment" (Document No. 36) and "Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment" (Document No. 37) were then filed on December 19, 2013.  Plaintiff failed to file a timely response, and on January 8, 2014, the Court issued an "Order" *sua sponte* advising Plaintiff of his right to respond pursuant to Roseboro v. Garrison 582 F.2d 309 (4th Cir. 1975).  (Document No. 39).  The undersigned also advised Plaintiff that "[f]ailure to file a timely and persuasive response will likely lead to the dismissal of this lawsuit."  Id.

"Plaintiff's Response In Opposition To Defendant's Motion For Summary Judgment" (Document No. 40) was filed on January 10, 2014;  and then on January 14, 2014, Defendant filed his "…Reply To Plaintiff's Memorandum In Opposition To Defendant's Motion For Summary Judgment" (Document No. 41), as well as a "…Motion To Strike Affidavits Filed By Plaintiff In Opposition To Defendant's Motion For Summary Judgment" (Document No. 42). Finally, Plaintiff's "Motion To Compel" (Document No. 48) was filed on March 3, 2014, well

after the extended dates for discovery, mediation and dispositive motions.  <u>See</u> (Document No. 35).

The pending motions have been fully briefed and are now ripe for review and disposition.

## II.     STANDARD OF REVIEW

The standard of review here is familiar.  Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.R.Civ.P. 56(a).  The movant has the "initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact."  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) (internal citations omitted).  Only disputes between the parties over material facts (determined by reference to the substantive law) that might affect the outcome of the case properly preclude the entry of summary judgment.  <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  A dispute about a material fact is "genuine" only if the evidence is such that "a reasonable jury could return a verdict for the nonmoving party."  <u>Id.</u>

Once the movant's initial burden is met, the burden shifts to the nonmoving party.  <u>Webb v. K.R. Drenth Trucking, Inc.</u>, 780 F.Supp.2d 409 (W.D.N.C. 2011).  The nonmoving party opposing summary judgment "may not rest upon the mere allegations or denials of his pleading, but ... must set forth specific facts showing there is a genuine issue for trial."  <u>Anderson</u>, 477 U.S. at 248.  In deciding a motion for summary judgment, a court views the evidence in the light most favorable to the non-moving party, that is, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  <u>Anderson</u>, 477 U.S. at 255.

At summary judgment, it is inappropriate for a court to weigh evidence or make credibility determinations.  Id.

## III.    DISCUSSION

### A.  Summary Judgment

Defendant acknowledges this Court's finding that the Amended Complaint contains enough facts to state a claim for relief that is plausible, but now asserts that Plaintiff is "unable to bring forth admissible evidence from which this Court may conclude that a trier of fact may find in Plaintiff's favor on his various claims for relief."  (Document No. 37, p.1).  Defendant further asserts that "[i]n the absence of genuine issues of material fact and because Defendant is entitled to judgment as a matter of law, Defendant's Motion For Summary Judgment (Dkt. No. 36) should be granted."  Id.  The undersigned will address Defendant's arguments, and Plaintiff's responses below.

#### 1.  Settlement Agreement

First, Defendant argues that the express terms of the "Settlement Agreement" executed in June 2008 bar Plaintiff's claims in this lawsuit.  (Document No. 37, pp.6-10).  Defendant notes that the "Amended Complaint" is restricted to what Plaintiff describes as "events and transactions giving rise to the claims of this complaint occurred or concern actions which occurred while Nelson and Defendant were both Corporate Officers of CSI."  (Document No. 37, p.6) (quoting Document No. 12, p.6).  As discussed above, Plaintiff became a corporate officer of CSI in or about March 2002, and was removed from the CSI Corporate Board on or about August 10, 2006.  See (Document No. 12, pp. 5, 9).  Defendant contends that Plaintiff's claims, whether "known or unknown," were subject to a valid global release and under North Carolina

law forever barred, when Plaintiff signed the "Settlement Agreement" on June 21, 2008.

(Document No. 37, pp.6-7).  The undersigned finds Defendant's legal authority persuasive:

> "A 'release' is a private agreement amongst parties which gives up or abandons a claim or right to the person against whom the claim exists or the right is to be enforced." <u>Financial Services of Raleigh, Inc. v. Barefoot</u>, 163 N.C.App. 387, 392, 594 S.E.2d 37, 41 (N.C.App. 2004).  "Releases are contractual in nature and their interpretation is governed by the same rules governing interpretation of contracts." <u>Chemmitels Processing, Inc. v. Schrimsher</u>, 140 N.C.App. 135, 138, 535 S.E.2d 594, 596 (2000) (citing <u>Hotel Corp. v. Taylor and Fletcher</u>, 45 N.C.App. 229, 234, 262 S.E.2d 869, 873 <u>rev'd on other grounds</u>, 301 N.C. 200, 271 S.E.2d 54 (1980)  "The scope and intent of the release should be governed by the intention of the parties, which must be determined by reference to the language, subject matter and purpose of the release." <u>Id.</u>
>
> "A release ordinarily operates on the matters expressed therein which are already in existence at the time of the giving of the release." <u>Barefoot</u>, 163 N.C.App. at 393, 594 S.E.2d at 41 (citing <u>Travis v. Knob Creek, Inc.</u>, 321 N.C. 279, 283, 362 S.E.2d 277, 279 (1987)).  However, a release may also be interpreted to apply to <u>existing but unknown claims</u>.  <u>Barefoot</u>, 163 N.C.App. at 394, 594 S.E.2d at 42 (underline added) <u>See also</u> <u>Talton v. Mac Tools, Inc.</u>, 118 N.C.App. 87, 90-91, 453 S.E.2d 563, 565 (1995)("Since this language was broad enough to cover all possible causes of action, whether or not the possible claims are all known, plaintiffs cannot rely on their ignorance of facts giving rise to a claim for fraud as a basis for avoiding the release.").  The effect of a valid settlement and release has been described as:
>
>> A completed compromise and settlement fairly made between persons legally competent to contract and having the authority to do so with respect to the subject matter of the compromise, and supported by sufficient consideration, operates as a merger of, and bars all right to recover on, the claim or right of action included therein, as would judgment duly entered in an action between said persons.
>
> <u>Jenkins v. Field</u>, 240 N.C. 776, 778, 83 S.E.2d 908, 910 (1954) (underscore added).

(Document No. 37, pp.7-8); see also, Simontacchi v. Invensys, Inc., 3:05cv283-MR, 2008 WL 141905, at *14-15 (W.D.N.C. Jan. 11, 2008) (quoting VF Jeanswear Ltd. Partnership v. Molina, 320 F.Supp.2d 412, 418-19 (M.D.N.C. 2004) (citing Talton, 118 N.C.App. at 90) ("When a release is executed in exchange for valuable consideration, the release provides a complete defense to an action for damages.")).

Defendant contends that the basis for all Plaintiff's claims transpired prior to April 8, 2008, and that as of June 21, 2008, Plaintiff knew or had reason to know of all claims he now asserts. (Document No. 37, pp.8-9). Moreover, Plaintiff executed the "Settlement Agreement," including its global release quoted above, with advice of counsel. (Document No. 37, p.10).

In deciding the "Defendant's Motion For Judgment On The Pleadings" (Document No. 14), the undersigned found Defendant's arguments regarding the effect of the "Settlement Agreement" compelling, but determined that at that stage of the litigation dismissal was premature based on Plaintiff's "plausible" allegations of fraudulent concealment by Defendant. (Document No. 27, pp.9-10). Defendant's pending "Motion For Summary Judgment" now provides the Court a thorough assessment of Plaintiff's allegations of concealment. (Document No. 37, pp.10-17). In short, Defendant concludes that there is no admissible evidence supporting Plaintiff's allegations. (Document No. 37, p.10).

"Plaintiff's Response In Opposition To Defendant's Motion For Summary Judgment" (Document No. 40) contends in conclusory fashion that there are genuine issues of fact in dispute, and moreover, that Plaintiff intends to conduct/complete further discovery to support his position. (Document No. 40, pp.1-2). Regarding the "Settlement Agreement," "Plaintiff's Response…" argues that it "was signed by Defendant without full and fair disclosure of material facts by a Fiduciary," and therefore, "lacks validity." (Document No. 40-1, p.8).

The undersigned again finds Defendant's argument regarding the effect of the "Settlement Agreement" compelling, and is convinced that Plaintiff has failed to identify admissible evidence to support his claims and/or to negate the "Settlement Agreement." The parties' arguments regarding Defendant's alleged concealment, which appears to be the basis of all Plaintiff's claims, will be discussed in detail below.

### 2. Concealment Allegations

#### a. Defendant's Tax Returns

To the extent Plaintiff alleges that he was deprived of present and/or future tax deductions based on CSI's corporate losses, Defendant contends that the fact Plaintiff did not receive any report acknowledging corporate losses "unequivocally proves that he was on notice of Defendant's alleged 'concealment' as of no later than 2003." (Document No. 37, p.11). Defendant argues that if Plaintiff was deprived of any benefit, he knew, or should have known, of that fact more than three (3) years before executing the "Settlement Agreement" and eight (8) years before filing this lawsuit. Id. As such, Defendant concludes that Plaintiff had actual knowledge of the allegedly improper accounting no later than 2004, and released any related claims against Defendant when he signed the "Settlement Agreement" on June 21, 2008. Id.

In his "...Response…" Plaintiff does not refute that he knew or should have known about the allegedly improper accounting by 2004. (Document No. 40-1, p.11). Moreover, Plaintiff fails to explain why any claim he might have related to allegedly improper accounting was not released by the "Settlement Agreement." Id. Plaintiff simply asserts that the evidence of the accounting indicates Defendant's "frame of mind" and "propensity of Defendant's self-enrichment nature." Id. See also, (Document No. 40-2, pp.22-23).

#### b. EPG's Interest in CSI

The crux of Plaintiff's lawsuit is that Defendant purposefully and fraudulently concealed from Plaintiff EPG's interest in acquiring CSI, schemed to "freeze-out" Plaintiff from CSI, then sold the company to EPG for $2,000,000. (Document No. 12). Plaintiff now suggests that Defendant's actions deprived Plaintiff of "approximately $620,000." (Document No. 40-1, p.11).

In responding to the allegation that Defendant deliberately and fraudulently concealed EPG's interest in CSI, Defendant first notes that the "Amended Complaint" explicitly states that:

> It was **well known in the commencement and race photography industry** that EPG was positioned for quick growth both organically and through aggressive acquisitions"
>
> 36. **In 2007 EPG systematically contacted <u>every</u> commencement photography company operating in the United States**. **This fact is well known throughout the commencement industry**.

(Document No. 37, p.12; Document No. 12, p.9) (emphasis added). The "Amended Complaint" also asserts that Plaintiff has been "involved and employed in the event photography industry beginning in the late 1970's" and was "instrumental in growing CSI from a modest annual income to a viable, strong and respected competitor in the commencement photography industry" in or around 2006-2008. (Document No. 12, pp.4, 6). Based on the assertions in the "Amended Complaint" itself, Defendant contends that Plaintiff had ample knowledge of EPG's potential interest in CSI at the time of the "Settlement Agreement." (Document No. 37, p.12).

The "Amended Complaint" alleges that Defendant was contacted by EPG between January 15, 2007 and June 30, 2007, in "a first attempt by EPG to purchase/acquire CSI." (Document No. 12, p.10). Plaintiff further alleges that Defendant purposely kept this information from Plaintiff and that this alleged non-disclosure was a direct breach of

Defendant's fiduciary duties as an officer and majority shareholder of CSI. (Document No. 12, pp.11-12).

Defendant's motion now argues that competent evidence contradicts Plaintiff's allegations. (Document No. 37, pp.12-13). Specifically, Defendant cites the affidavit of EPG's Chief Executive Officer, Paul C. Rasmussen ("Rasmussen"). (Document No. 37, p.12). In his affidavit, Rasmussen states that EPG expressed interest in CSI in July 2007, and then again in September 2007, but that in each instance Defendant stated he was not interested in any deal to sell CSI. Id.; (Document No. 36-3). Defendant argues, and the Rasmussen and Montgomery affidavits support, that EPG did not approach Defendant or CSI about a purchase or sale of CSI "in the six months preceding the date" of the June 2008 "Settlement Agreement," consistent with the representations of that agreement. See (Document No. 37, pp.12-13; Document No. 36-2; Document No. 36-3; Document No. 12-6, p.4).

Defendant acknowledges that EPG had approached him and expressed interest in "'a deal' years earlier," but states that those "interludes never progressed beyond an invitation to discuss the matter because Defendant was not interested in selling CSI." (Document No. 37, p.5) (citing Document Nos. 36-2 and 36-3). Defendant contends that under different circumstances, following his wife's cancer diagnosis, discussions regarding EPG's purchase of CSI were held in October 2008. Id. CSI and EPG "entered into a Letter of Intent for the sale of CSI's assets to EPG" in October 2008. Id. EPG acquired all of CSI's assets in January 2009. Id.

Defendant also notes that the sole source of Plaintiff's "erroneous belief that (a) Defendant withheld information about EPG's efforts to purchase CSI and (b) CSI and EPG conspired to delay the EPG/CSI deal is Bruce Franke." (Document No. 37, p.13); see also (Document No. 36-5, p.5 and Document No. 36-6, p.2). Contrary to Plaintiff's suggestion that

the testimony of Bruce Franke ("Franke") would provide evidence to support his allegations, Franke's affidavit provides that he was not familiar with the negotiations between EPG and CSI; the timing of negotiations between EPG and CSI; and/or the details of any transaction between EPG and CSI. (Document No. 36-4). Franke further stated that he "did not provide Mr. Nelson any information about the Event Photography Group, Inc. and Commencement Specialists, Inc. deal." Id.

Defendant concludes that the record of admissible evidence establishes without question its timeline of events leading to the sale of CSI, and that CSI and EPG did not discuss a "sale" for more than a year prior to October 2008. (Document No. 37, pp.13-14).

In his response, Plaintiff asserts that he "was not aware of the 2007 'systematic' contact by EPG of every commencement photography company in the United States until a conversation with Paul Rasmussen on April 24, 2010." (Document No. 40-1, p.13). This assertion appears inconsistent with the allegation in the "Amended Complaint" that the fact of EPG's systematic contacts in 2007 "is well known throughout the commencement photography industry." (Document No. 12, p.9); (Document No. 40-2, pp.36-37). However, even accepting as true that EPG had contacts with CSI in 2007 about purchasing/acquiring CSI, such contacts are not precluded by the "Settlement Agreement" (Document No. 12-6). See (Document No. 12, p.10).

As with most, if not all, Plaintiff's claims, Plaintiff has not persuasively articulated why the June 2008 "Settlement Agreement," with its global release, does not preclude Plaintiff's allegations regarding Defendant's alleged concealment of contacts with EPG in 2007. Plaintiff has been allowed ample time to produce evidence, and/or legal authority, to support his contention that Defendant fraudulently concealed EPG's interest in CSI, but to date he has failed.

Without more, the undersigned agrees with Defendant that the "Settlement Agreement" precludes Plaintiff's claims.

### c. Relocation of CSI

Defendant also notes that Plaintiff alleges that CSI's relocation from Defendant's garage to the Ben Craig Center, a non-profit corporation in partnership with the University of North Carolina at Charlotte, is another example of Defendant's attempts to "freeze-out" Plaintiff and to withhold important CSI information. (Document No. 37, p.14) (citing Document No. 12, p.11). CSI moved to the Ben Craig Center in or about March 2007. (Document No. 36-2, p.2). Defendant argues that "CSI's move to the Ben Craig Center was promoted in a press release and disclosed to the company, employees, vendors and customers." (Document No. 37, p.15) (citing Document No. 36-2). Moreover, Defendant contends that Plaintiff cannot set forth a measure of damages arising from the relocation of CSI to the Ben Craig Center. Id.

Plaintiff offers little, if any, argument that there is a genuine issue of fact supporting his contention that CSI's move was conducted fraudulently or otherwise supports the claims in the "Amended Complaint." (Document No. 40-1). Instead, Plaintiff asserts that CSI's move showed a "propensity of the Defendant's blatant disregard of his fiduciary duties . . . in the confirmed fact that he notified everyone of the relocation, EXCEPT the Plaintiff who was still a CSI shareholder during that period of time." (Document No. 40-1, p.12).

Plaintiff seems to acknowledge that he did not suffer any harm based on CSI's relocation. Id. Even if Plaintiff does still allege any harm or wrongdoing based on CSI's relocation, he does not explain why such a claim was not released by the "Settlement Agreement" which was executed more than a year after the relocation.

### d. CSI's Value

Next, the motion for summary judgment notes, as discussed above, that Plaintiff was aware of CSI's 2006 income of $945, 727.65, and that the total income increased in 2007-2008 to "in excess of $1,000,000.00." (Document No. 37, p.15) (citing Document No. 12, pp.6, 11). Defendant reasonably suggests that Plaintiff contention that he was aware of CSI's income in excess of $1,000,000, but relied on an alleged statement that "CSI had no value," is contradictory. (Document No. 37, pp.15-16). It also appears contradictory that CSI would have "no value," but would voluntarily dismiss its lawsuit against Plaintiff and pay him $38,000.00 in settlement funds, apparently in exchange for acquiring all his shares in CSI. (Document No. 12-6, p.2).

In addition, Defendant contends that Plaintiff could have elected many remedies to determine the value of CSI, including an inspection of the company's corporate records pursuant to N.C.Gen.Stat. § 55-16-02. (Document No. 37, p.15). Defendant concludes that Plaintiff knew or should have known that CSI had value. (Document No. 37, p.16).

"Plaintiff's Response In Opposition…" does not offer any argument or evidence rebutting Defendant's motion or further supporting Plaintiff's claim regarding valuation of CSI. (Document No. 40-1). Furthermore, Plaintiff has failed to show why any alleged wrongdoing by Defendant regarding representations of CSI's value was not released by the "Settlement Agreement."

### e. Acquisition of Moore's Shares

Finally, Defendant's motion addresses Plaintiff's allegation that Defendant covertly acquired Moore's 10% share holdings, in violation of the CSI "Shareholder Agreement" (Document No. 12-2). (Document No. 37, pp.16-17). Defendant contends that Plaintiff offers no sufficient basis to prove Defendant's purchase of Moore's shares constitutes a claim that was

17

not released by the "Settlement Agreement." (Document No. 37, p.16). Moreover, Defendant refutes the suggestion that the purchase was "withheld" or "concealed" from Plaintiff by noting that Moore's omission as a party to the "Settlement Agreement" put Plaintiff on actual notice that Moore had sold his shares to one of the remaining CSI shareholders. Id. Defendant purchased Moore's shares in or around November 2007, more than seven (7) months prior to execution of the "Settlement Agreement." (Document No. 36-2, p.3).

In response, Plaintiff argues that the transfer of Moore's shares "was done in a covert and improper manner." (Document No. 40-1, pp.5-6). Plaintiff concludes that this transfer violated the "Shareholder Agreement" (Document No. 12-2) and is evidence of a breach of Defendant's fiduciary duty to Plaintiff. Id. However, Plaintiff fails to respond to Defendant's argument that he knew or should have known by the time of the "Settlement Agreement" that Moore's shares had been sold, or that the "Settlement Agreement" released known and unknown, claims against Defendant.

Plaintiff was allowed the opportunity to conduct discovery to identify support for what seemed like a plausible claim earlier in this litigation, but he has failed to produce such evidence. For example, he has presented no admissible evidence or persuasive argument that Defendant fraudulently concealed the ownership of CSI's shares at the time of the "Settlement Agreement" or that the global release of the "Settlement Agreement" is inapplicable to this claim. The undersigned is persuaded that any alleged wrong committed by Defendant in relation to the "Shareholder Agreement" or the transfer of Moore's shares, was released by the "Settlement Agreement."

### 3. Admissible Evidence

The pending motion for summary judgment also presents a compelling argument that Plaintiff has failed to satisfy his burden of asserting admissible facts to support his claims. (Document No. 37, pp.17-20).  As noted above, Defendant has provided the affidavits of Rasmussen and Franke which clearly contradict Plaintiff's suspicions and allegations regarding dealings between EPG and CSI.  (Document Nos. 36-3, 36-4).  The only evidence Plaintiff forecast to support his case was the testimony of Franke, which would now appear to be of no assistance to Plaintiff since Franke has testified that he "did not provide Mr. Nelson any information about the Event Photography Group, Inc. and Commencement Specialists, Inc. deal."  (Document No. 37, p.19) (quoting Document No. 36-4); see also (Document No. 36-5, p.5).

Defendant again asserts that both Rasmussen's and Defendant's recollection is that no conversations about the sale of CSI or its assets took place in the six (6) months prior to the execution of the "Settlement Agreement."  (Document No. 37, p.19).  On this point, the undersigned also notes that the "Amended Complaint" asserts in at least three (3) places that Defendant committed fraud by stating that "CSI had **no contact** with EPG in the six (6) months preceding Wednesday, June 18, 2008."  (Document No. 12, pp.18, 22, and 26) (emphasis added).  The undersigned observes that the relevant clause in the "Settlement Agreement" did not stipulate that there had been "no contact" with EPG; rather, it provided that "to the best of their knowledge and belief, neither Montgomery nor the Company ha[d] been approached by a potential buyer about the purchase or sale of the company . . . in the six months preceding the date of th[e] Agreement."  (Document No. 12-6, p.4).  In fact, the "Settlement Agreement" does not appear to mention EPG at all, nor stipulate to a lack of "contact" with any entity.  Id.

In his "…Response…" Plaintiff argues that it is "reasonable to allege that the Defendant had contact with EPG between December 18, 2007 and June 18, 2008." (Document No. 40-1, p.9). Plaintiff argues that if EPG representatives had "any type of contact" with Defendant between December 18, 2007 and June 18, 2008, "the Settlement Agreement could be considered by the Court and/or a Jury to be breached by the Defendant." <u>Id.</u> The undersigned respectfully disagrees. First, Plaintiff fails to present any evidence of Defendant's alleged contact with EPG, or any potential buyer, during the relevant time period. Moreover, the "Settlement Agreement" did not preclude "any type of contact," it stipulated that CSI had not "been approached by a potential buyer about the purchase or sale of the company . . . in the six months preceding the date of" the Agreement. <u>See</u> (Document No. 12-6, p.4).

Whether or not CSI had any "contact" with EPG, or any other entity, in the six months prior to the "Settlement Agreement" that did not relate to potential sale of all or part of CSI, is not relevant to the issues before the Court and would not support Plaintiff's fraud claims. Most importantly, Plaintiff has failed to forecast any evidence that raises a genuine issue of material fact regarding his claims of fraud and/or breach of the "Settlement Agreement." Plaintiff appears to rely on his own affidavit, and/or the affidavit of his wife Theresa J. Peck, to support statements allegedly made to Plaintiff by Rasmussen and/or Franke regarding negotiations between CSI and EPG. (Document No. 40-2, pp.34-40). Defendant makes a persuasive argument that these affidavits "represent nothing more than inadmissible hearsay." (Document No. 41, p.3). It does not appear that Plaintiff ever made a timely attempt to depose Rasmussen, Franke, or Peck.

Plaintiff suggests that if he is allowed additional time for discovery, and/or if the Court compels Defendant to respond differently to discovery already requested, then he might have

evidence to support is claims. (Document No. 40). At this point in the case, Plaintiff's position is insufficient and untimely.

### 4. Conclusion

Based on the foregoing, the undersigned finds that Defendant has adequately demonstrated the absence of a genuine issue of material fact regarding the claims in the "Amended Complaint," and that the *pro se* Plaintiff, even viewing the facts in the light most favorable to him, has failed to set forth specific facts showing there is a genuine issue for trial. See Celotex Corp, 477 U.S. at 323; Anderson, 477 U.S. at 248. As such, "Defendant's Motion For Summary Judgment" (Document No. 36) will be granted.

### B. Motion To Strike

"Defendant's Motion To Strike Affidavits Filed By Plaintiff…" (Document No. 42) is well-reasoned; however, under the circumstances the Court will deny the motion as moot. As noted above, the undersigned has already concluded that Plaintiff has failed to present or forecast admissible evidence showing there is a genuine issue for trial.

### C. Motion To Compel

As an initial matter, the undersigned also finds that the pending motion to compel is mooted by the Court's decision to grant summary judgment to Defendant.

In addition, the undersigned finds that Plaintiff's motion is untimely, as it was filed well after the discovery and motions deadlines, and after Defendant's motion for summary judgment was fully briefed. It is noteworthy that Plaintiff requested, and was allowed, an extension of time for discovery in December 2013, but waited until March 2014 to file the instant motion. (Document Nos. 34, 35). Plaintiff specifically stated in his motion for extension of time on December 6, 2013, that he needed additional time to resolve discovery issues and/or to file a

motion to compel, but inexplicably failed to seek relief from the Court related to that discovery until March 3, 2014. (Document No. 33, p.4; Document No. 48).

The undersigned is also not convinced that the Court could allow the requested relief even if Plaintiff's motion was timely filed,

## IV. CONCLUSION

**IT IS, THEREFORE, ORDERED** that "Defendant's Motion For Summary Judgment" (Document No. 36) is **GRANTED**.

**IT IS FURTHER ORDERED** that "Defendant's Motion To Strike Affidavits Filed By Plaintiff In Opposition To Defendant's Motion For Summary Judgment" (Document No. 42) is **DENIED AS MOOT**.

**IT IS FURTHER ORDERED** that Plaintiff's "Motion To Compel" (Document No. 48) is **DENIED AS MOOT**.

**SO ORDERED**.

Signed: April 16, 2014

David C. Keesler
United States Magistrate Judge